# Ex parte H. P. CREASY, Petitioner.

**In Banc, June 10, 1912.**

1. **HABEAS CORPUS: Contempt: Conclusiveness of Judgment.**
The judgment of the circuit court committing the petitioner
for contempt is not conclusive upon the facts when issues as to
facts are made upon the hearing of the writ of *habeas corpus*
in the Supreme Court. If the facts show that petitioner was not
guilty of contempt the judgment adjudging him, guilty is not
conclusive, and the Supreme Court will go behind the recital
in the judgment committing him and ascertain if the facts
amount to a contempt of court. A judgment committing peti-
tioner for contempt can be attacked in *habeas corpus* for (1)
want of jurisdiction over the person, (2) want of jurisdiction
over the subject-matter and (3) want of jurisdiction in the
particular case owing to the fact that the facts thereof do not
constitute contempt, although the judge rendering it has ad-
judged them to be contemptuous and although jurisdiction of
the person and subject-matter may fully appear.

2. ———: ———: **Equivocating Answer at Grand Jury In-
quiry.** A witness who answered a question propounded to him
by the foreman of the grand jury, by whom he was asked if
at a certain hour and place he had bought whiskey, with the
words: "I could not say; possibly I did. I cannot say; proba-
bly I did," was not guilty of contempt. The answers may have
been untruthful, and may tend to show perjury, but they are
not sufficient to support a charge of contempt for refusing to
answer the questions. And being adjudged guilty of contempt
where there was no contempt, he is entitled to his discharge.
    *Held*, by WOODSON, J., concurring, that since the witness was
        sworn and did not refuse to answer, the court had no power
        to try him for contempt, but if his answers were untrue
        he could be tried only by a jury and for perjury.

3. ———: ———: **Judgment Must Recite Facts.** The statute
requires that whenever any person shall be committed for any
contempt the particular circumstances of his offenses shall be
set forth in the order or warrant of commitment; and that
means that, when a witness is punished for a contumacious and
unlawful refusal to answer any legal and proper interrogatory
propounded to him by the grand jury, both the questions and
his answers, if he did answer, shall be set forth in the judg-
ment, and if he refused to answer the words of his refusal
should be set out; and if the judgment recites that the court
believes and finds that the witness was wilfully withholding
proper information sought by the grand jury, the facts upon
which that conclusion is based should be set forth.

4. ———: ———: **Excessive Punishment: Statute.** A commitment for contempt to six months' imprisonment is unlawful. The cases of State ex inf. v. Shepherd, 177 Mo. 179, and Railroad v. Gildersleeve, 219 Mo. 170, holding invalid Sec. 3882, R. S. 1909, are overruled, for the reasons stated by LAMM, J., in the Gildersleeve case.

5. ———: ———: ———: **Until Witness Will Testify.** The statute permits a witness to be committed to jail for refusing to testify only "until he gives such evidence." A commitment which shuts off the witness's right to purge himself of the contempt is unlawful.

## Habeas Corpus.

PETITIONER DISCHARGED.

*McBain & Clark* for petitioner.

(1) The record in this case affirmatively shows that the petitioner was not in contempt of court and did not refuse to answer questions asked him by the foreman of the grand jury, and a court has no power or authority to punish one for something that in point of law and fact is not a contempt of court. State ex rel. v. Lazarus, 37 La. Ann. 314; In re Clark, 208 Mo. 121; In re Dell, 32 Kan. 668; In re Ayers, 123 U. S. 507; Ex parte Fisk, 113 U. S. 713; Bushell's Case, 1 Vaughn, 135, 6 How. St. Tr. 999; People v. Kavanaugh, 220 Ill. 49; State ex rel. v. Wear, 135 Mo. 265; 7 Am. & Eng. Ency. Law (2 Ed.) 36; 2 Church on Habeas Corpus (2 Ed.) 454; Wyatt v. People, 17 Colo. 261; In re Shortridge, 34 Pac. (Cal.) 227. The true state of the facts may be shown, upon *habeas corpus,* though inconsistent with the recitals in the commitment, to show that in point of law and fact there was no contempt of court. In re Shull, 221 Mo. 623; In re Clark, 208 Mo. 121; Ex parte O'Brien, 127 Mo. 477; Ex parte Duncan, 62 S. W. (Tex.) 758; Ex parte Irvine,

74 Fed. 954. The judgment and commitment in this case is insufficient and void because it fails to set forth the facts constituting the alleged contempt. Sec. 3884, R. S. 1909; In re Shull, 221 Mo. 623; Ex parte Kearney, 7 Wheat. 38; Church on Habeas Corpus (2 Ed.), sec. 308; Hawes v. State, 46 Neb. 149; Bachelor v. Moore, 42 Cal. 412; Schwarz v. Court, 111 Cal. 106. (2) The punishment assessed against the petitioner —six months' imprisonment—is excessive and contrary to common law practice and the statutes of Missouri, and beyond the power and authority of the circuit court that imposed the punishment. R. S. 1909, secs. 5080-82 and 6372; Ward v. State, 2 Mo. 120; Ex parte Renshaw, 6 Mo. App. 474; In re Brockman, 233 Mo. 135; Ex parte Eichel, 223 Mo. 258; Ex parte Gauss, 223 Mo. 277; Bracy's Case, 5 Mod. 308; People ex rel. v. Fancher, 9 N. Y. Sup. Ct. 226; In re Clark, 28 L. R. A. (Conn.) 242. Sec. 6372, R. S. 1909, giving the court power to commit a witness to jail, until he shall answer, where the witness refuses to answer, is constitutional. Railroad v. Gildersleeve, 219 Mo. 170; Pub. Co. v. Journal, 58 N. Y. Supp. 708; Ex parte Wright, 65 Ind. 504; Ex parte Crenshaw, 80 Mo. 447; State ex rel. v. Bland, 189 Mo. 197; State ex rel. v. Shepherd, 177 Mo. 205; State v. Morrill, 16 Ark. 386; Coles v. Egan, 52 Conn. 219; Wyatt v. People, 17 Colo. 261; Ex parte Edwards, 11 Fla. 174; Swafford v. Berrong, 84 Ga. 65; Little v. State, 90 Ind. 338; Stewart v. State, 140 Ind. 7; In re Millington, 24 Kan. 214; Arnold v. Comm., 80 Ky. 300; State v. St. Paul, 104 La. 203; Langdon v. Judges, 76 Mich. 358; Sloman v. Judges, 95 Mich. 264; State ex rel. v. Missen, 108 N. W. (Minn.) 513; State ex rel v. Judges, 24 Mont. 33; In re Patterson, 99 N. C. 407; Matter of Hatfield, 45 N. Y. Supp. 270; Meyers v. State, 46 Ohio St. 473; McCarthy v. State, 89 Tenn. 543; Ex parte Tinsley, 37 Tex. Crim. App. 517; State v. McClaugherty, 33 W. Va. 250; In re Prince, 44 Wis. 411.

*E. C. Anderson* and *W. H. Sapp* for respondent.

(1)   When a party is brought before a court on a writ of *habeas corpus,* and the return shows he is in custody under the commitment for contempt, the only questions to be considered are: (a)   Had the court jurisdiction to commit, and (b) is the commitment in legal form charging the contempt?   The primary and sole purpose of the writ of *habeas corpus* is to institute an inquiry for the purpose of determining whether the officer detaining the petitioner is authorized by law to so restrain him of his liberty. Its attack is directed against the paper (commitment) under which the officer is operating.   For this reason it is a collateral proceeding in so far as the judgment of the court on which the commitment is based, is concerned.   Naturally the questions in all such proceedings are:   (a)   Had the court jurisdiction to commit, and (b) is the commitment in legal form charging the contempt.   Sec. 2472, R. S. 1909, makes this very plain in so far as the duty of the superior court is concerned in a *habeas corpus* proceeding where the records disclose a commitment for contempt.   Ex parte Millet, 37 Mo. App. 76; Ex parte Goodin, 67 Mo. App. 637; Ex parte Toney, 11 Mo. 661; Ex parte McKee, 18 Mo. 600; Church on Habeas Corpus, sec. 315; 9 Cyc. 64.   (2) . The commitment was issued by a constitutional court proceeding, according to the course of the common law, which unquestionably had authority to commit for contempt. Constitution, art. 6, sec. 22; Sec. 3846, R. S. 1909; Railroad v. Gildersleeve, 219 Mo. 170.   (3)   The judgment and commitment are in legal form and clearly charge the facts constituting the contempt.   The facts recited in the judgment and commitment constitute and charge the contempt.   In re Waldrip, 1 Ariz. 482; R. S. 1909, sec. 3884; In re Shull, 221 Mo. 623; In re Cogshall, 100 ' Mo. App. 585; Ex parte Millett, 37 Mo. App. 676; Ex

parte Priest, 76 Mo. 229; Ex parte McKee, 18 Mo. 599. (4) Petitioner was guilty of a direct contempt; therefore punishment was summarily inflicted without a hearing or opportunity given to petitioner to make defense which was regular. R. S. 1909, secs. 3883, 5080 and 5081; Ex parte Eichel, 223 Mo. 258; In re Clark, 208 Mo. 146; Ex parte Renshaw, 6 Mo. App. 474; Ex parte Buskett, 106 Mo. 602; Ex parte Mason, 16 Mo. App. 41; Ward v. State, 2 Mo. 120. (5) No evidence can be admitted or proof made of facts inconsistent with the recitals in the judgment and commitment to show that said recitals are false. The recitals in a judgment rendered and commitment issued, for contempt by a constitutional court possessing common law powers, are conclusive. Ex parte Millet, 37 Mo. App. 76; Ex parte Renshaw, 6 Mo. App. 474; Ex parte Hollwedell, 74 Mo. 473; Ex parte Goodin, 67 Mo. 637. The judgment of a court of record cannot be attacked collaterally although it might be possible to introduce an abundance of evidence to show that the facts on which the same was rendered were false. Ex parte Toney, 11 Mo. 661; In re Truman, 44 Mo. 195; Ex parte Page, 49 Mo. 292; Latshaw v. McKee, 50 Mo. 384; Hurd v. Sock, 81 Mo. 616; Neenan v. St. Joseph, 126 Mo. 93; Ex parte Gray, 77 Mo. 161; State ex rel. v. Riley, 219 Mo. 681. The punishment assessed against the petitioner is not excessive and is not contrary to the common law practice. Secs. 5082 and 6372, R. S. 1909, are unconstitutional and void in that the Legislature attempted thereby to abridge, limit, and impair an inherent power, viz.: Power to punish for contempt, which right is vested in all constitutional courts which have common law powers. Railroad v. Gildersleeve, 219 Mo. 170; State ex inf. v. Shepherd, 177 Mo. 209; State ex rel. v. Ryan, 182 Mo. 349. Should the court reverse the holdings of these cases, then we take it, that this court will not discharge the petitioner for a mere irregularity in the.

proceedings. For if the punishment assessed by the circuit court of Boone county is in excess of that permitted by law, then this court will limit the punishment to such as may be lawful. Secs. 2511 and 5316, R. S. 1909; Ex parte Crenshaw, 80 Mo. 456; In re Boquette, 14 Mo. App. 576; Ex parte Kinney, 105 Mo. 535; State v. Bockstruck, 136 Mo. 335; In re Knaup, 144 Mo. 665.

KENNISH, J.—The petitioner, H. P. Creasy, presènted his application for a writ of *habeas corpus* to a member of Division No. 2 of this court, in vacation, alleging in his petition that he was unlawfully imprisoned and restrained of his liberty by the sheriff of Boone county. The writ was granted as prayed, and made returnable to said Division No. 2, at the October term thereof, 1911. In due time the sheriff made return, whereupon the petitioner filed a reply, which, under the agreed statement of facts, may be treated as a demurrer to the return. The case was submitted for decision upon an agreed statement of facts which fully covers every question presented for decision. Roy, C., sitting in said division and to whom the case was assigned, submitted an opinion, concurred in by Blair, C., sustaining the judgment of the trial court committing the petitioner for contempt, and remanding him to the custody of the sheriff. That opinion is in accord with the cases of State ex inf. v. Shepherd, 177 Mo. 205, and Railroad v. Gildersleeve, 219 Mo. 170, hereinafter referred to. Without adopting that opinion as the opinion of this court (there being grave questions involved, heretofore decided by a divided Court in Banc contrary to the views of Division Two) the cause was transferred by said division to the Court in Banc, where it was again argued and submitted, and assigned to the writer for an opinion.

Before the case was so assigned in Banc, an opinion dissenting from that prepared by Roy, C., was filed by my learned associate, Graves, J. After an examination of the record and the questions of law involved, I have concluded that the opinion filed as a dissent contains such an exhaustive review of the law and is so sound in its reasoning and conclusions that it would be useless to attempt to add thereto. I shall therefore set out, as a statement of the case, the agreed statement of facts filed by the parties hereto, and adopt, as the opinion, what was thus filed by Graves, J., as a dissent.

### .AGREED STATEMENT OF FACTS.

"It is agreed by and between petitioner and respondent herein, for the purpose of avoiding the necessity of taking testimony, that this cause shall be submitted to the court upon the following statement of facts, which it is agreed, if the evidence were taken, would be disclosed by the evidence; it being further agreed that any fact hereinafter set forth may be objected to for irrelevancy or immateriality in the argument and submission of this cause, by either party hereto.

"It is further agreed that respondent waives no right to object to the consideration of the facts leading up to and surrounding the commitment of petitioner.

"1.   That the grand jury called at the October term of the Boone county circuit court, 1911, before which petitioner was called as a witness, was a duly called and qualified grand jury and that W. F. Robinson was the duly authorized and acting foreman of said grand jury.

"2.   That H. P. Creasy was duly subpoenaed before the grand jury on the 4th day of October, 1911. That at the time said Creasy appeared before said

grand jury, said grand jury had under consideration the investigation of the illegal sale of intoxicating liquors in Boone county by divers and sundry persons.

"That petitioner was then asked the following questions by the foreman of said grand jury: 'Q. 1. H. P. Creasy, did you on September 22, 1911, buy one pint of whiskey for Jimmy, the tailor that works for Harrell? Q. 2. H. P. Creasy, did you on Thursday, September 21, 1911, about six o'clock p. m., buy one pint of whiskey for Tom Newby, from the negro, Squire Bannister, at Tom Morris's drugstore?'

"That said H. P. Creasy replied to said questions that he did not remember whether he did, on September 22, 1911, buy one pint of whiskey for Jimmy, the tailor that works for Harrell, and did not remember whether he did, on Thursday, September 21, 1911, about six o'clock p. m., buy one pint of whiskey from the negro, Squire Bannister, at Tom Morris's drugstore.

"That upon being further asked and commanded to answer, he made the following reply to the aforesaid questions: Answer to question No. 1: 'I could not say; possibly I did.' Answer to question No. 2: 'I could not say; probably I did.'

"That the said H. P. Creasy was released and discharged from attendance upon said grand jury, but thereafter, on the afternoon of said date, to-wit, October 4, 1911, he was again summoned to appear before said grand jury and again the questions above referred to, number 1 and number 2, were asked him, and that on this occasion, being the second time he had appeared before said grand jury, petitioner made the same answer, to-wit: Answer to question number 1: 'I could not say; possibly I did.' Answer to question number 2: 'I could not say; probably I did.'

"That thereupon the foreman of the grand jury, W. F. Robinson, wrote out said questions and answers set forth in 'Exhibit B,' attached to petitioner's ap-

plication for the writ of *habeas corpus* herein, which questions and answers as there referred to are as follows:

" 'Number 1. H. P. Creasy, did you on September 22, 1911, buy one pint of whiskey for Jimmy, the tailor who works for Harrell? Answer. I could not say; possibly I did. Number 2. H. P. Creasy, did you on Thursday, September 21, 1911, about six o'clock p. m., buy one-half pint of whiskey for Tom Newby, from the negro, Squire Bannister, at Tom Morris's drugstore? Answer. I could not say; probably I did." The above questions were asked the witness, H. P. Creasy, and he made the answers above recorded, which are not satisfactory answers to the grand jury. W. F. Robinson, Foreman.'

"These questions and answers were sent by the foreman of the grand jury as above set forth to the Hon. David H. Harris, judge of the Boone county circuit court then in session, and the court notified the grand jury that the witness was bound to answer these questions, 'yes' or 'no;' that when the foreman of the grand jury so informed Creasy that his answers must be 'yes' or 'no,' he stated that he could not answer the questions 'yes' or 'no.'

"Said H. P. Creasy was then taken before the Hon. David H. Harris, judge of the court aforesaid, and while said court was in session, and he was asked by the court if he fully understood the questions, to which he replied that he did. To refresh his memory he was then asked by the court if he knew the persons mentioned in the questions and if he was in Columbia on the dates named, to which he replied in the affirmative. He was then asked if he was afflicted with a defective memory, to which he replied that his memory was as good as it ever was. It was then explained to him by said court that what the grand jury wanted was an unequivocal answer to their questions, that is, yes or no, and that the events being of such

recent occurrence he certainly should be able to remember them. He then replied to said court, 'I can't give them any different answer—this is the best I can do for you.' And from his manner of replying to the court's questions and from his general demeanor while before the court, there was no question in the mind of the court that the witness was wilfully and knowingly withholding proper information sought by the grand jury, and that the answer was considered by the court to be evasive and equivocal, and was considered by the court simply a subterfuge to avoid answering at all, and in the opinion of the court amounted to a refusal to answer, and so believing and holding, the court adjudged him guilty of contempt as set out in the order, a copy of which is attached to respondent's return.

"3. That respondent holds petitioner by virtue of the order and judgment of the circuit court of Boone county, Missouri, duly entered of record on the 4th day of October, 1911, by the clerk of said court, and a certified copy thereof under the hand and seal of the clerk of said court made out and delivered to this respondent as sheriff of, Boone county, Missouri, and that respondent holds petitioner under no other warrant, commitment or authority other than the order and judgment aforesaid and the certified copy of said order and judgment delivered to said respondent by the clerk of said court as aforesaid."

## OPINION.

"I. First: I do not agree that the judgment of the court *nisi* in contempt proceedings is conclusive in this court upon the facts, when issues as to the facts are made upon the hearing of the writ of *habeas corpus*.

"The writ of *habeas corpus* has a peculiar constitutional sanctity, which this court will not permit

to be frittered away by any judicial ascertainment of the facts, except the ascertainment made by the court trying the case under this peculiar writ of right. Our constitutional provision as to writs of *habeas corpus* has a deep-seated meaning. It was lodged there for the sole purpose of affording one deprived of liberty the right to have the cause of his detention investigated, and, too, whether such detention was upon the judgment of a court, or was upon some other alleged authority. To say that the committing court, in contempt proceedings, can absolutely conclude an investigation of the facts by the tribunal hearing the writ of *habeas corpus,* is giving the judge whose court has been the target of an alleged contempt, more power than our Constitution ever contemplated.

"If such be the law, the only thing left for the court hearing the writ of *habeas corpus,* is to determine whether the judgment and writ of commitment are regular upon their face. If they are, then the prisoner must be remanded, it matters not how flagrantly the offended judge may have disregarded the facts. Judgments in contempt proceedings are in a measure different from other judgments. They are judgments entered by one not altogether disinterested. They may not be cool, dispassionate judgments, but may be shaded by the feelings of one presiding over a court thought to have been outraged by the conduct of a person in attendance upon such court. Human liberty is too sacred under our Constitution to say that, under a judgment emanating from such a source, the actual facts are not for review in the court trying the writ of *habeas corpus.* Mere jurisdiction of the person and the subject-matter is not and should not be the test of a valid judgment in a contempt proceeding. This is the test in ordinary judgments, but out of respect for constitutional provisions with reference to the writ of *habeas corpus,* many courts have gone fur-

ther and as to contempt judgments have said that in order to sustain the contempt judgment, it must not only be shown that the court.had jurisdiction of the person, and of the subject-matter, i. e., contempt, but that it must be shown that under *both the law and the facts* the particular judgment could be sustained.

"A learned discussion of this exact point is found from the pen of DAVIDSON, P. J., of the Texas Court of Criminal Appeals, in the case of Ex parte Duncan, 62 S. W. 758. In the course of his opinion in that case Judge DAVIDSON says:

" 'There is nothing in evidence before this court, outside the facts recited in the judgment entered on the 21st of March, which shows that relator made use of any language in any way discourteous, or which could have been, under the circumstances, construed in any other way than an indignant protest of an unoffending citizen against the unlawful arrest and humiliation to which he had been subjected, without legal authority, nor was his manner offensive or discourteous, but, upon the contrary, all the evidence (*the facts recited in the judgment excepted*) shows that neither his language nor his manner was in any respect offensive, such as to form the basis for the proceeding in contempt. A judgment which is void is conclusive of nothing, and may be the subject of inquiry in a collateral proceeding. The recited facts therein are not binding in any way nor for any purpose. Nor can the court make contempt of that which is not contempt (Church, Hab. Corp., sec. 152); and every attempt to do so would be in excess of authority or jurisdiction, as much so as if the court had no authority or power to punish for contempt, either in relation to the person or subject-matter. There must be contempt in order to justify punishment for that offense. "There are three essential elements necessary to render conviction valid. These are that the court may have jurisdiction over the subject-matter, the per-

son of the defendant, and the authority to render the particular judgment. If either of these essential elements are lacking, the judgment is fatally defective, and the prisoner held under such judgment may be released on *habeas corpus*." [Ex parte Degener, 30 Tex. App. 576; Ex parte Taylor, 34 Tex. Cr. R. 591; Ex parte Tinsley, 37 Tex. Cr. R. 517; Ex parte Kearby, 35 Tex. Cr. R. 531; Id., 35 Tex. Cr. R. 634; Brown, Jur., secs. 109, 110; Ex parte Lake, 37 Tex. Cr. R. 656.] "Some of the older authorities regard jurisdiction of the matter and the prisoner sufficient to give the court jurisdiction to pronounce the judgment, which could not be successfully assailed by this writ. The rule now, supported by high and abundant authority and excellent reason, is that the court must not only have jurisdiction over the person and the matter, but authority to render the particular judgment. The judgment is not conclusive upon the question of the authority of the court to render it. That, as well as any other matter which would render the proceedings void, is open to inquiry." [7 Am. and Eng. Ency. Law (2 Ed.), 36; People v. Liscomb, 60 N. Y. 559; People v. Court of Oyer and Terminer, 101 N. Y. 245, 54 Am. Rep. 691; Ex parte Degener, 30 Tex. App. 566; Holman v. Mayor, 34 Tex. 668; Ex parte Fisk, 113 U. S. 713.]

"Jurisdiction of the person and the subject-matter are not alone conclusive, but the authority of the court to render the particular judgment is the subject of inquiry; and if, upon a review of the whole record, it appears that a judgment unwarranted by law was entered, the party thus placed in contempt will be released under the writ of *habeas corpus*. [Same authorities.] Among other jurisdictional defects is also found the following: The infliction of punishment in excess of that allowed by law. [Ex parte Edwards, 11 Fla. 174; Haines v. Haines, 35 Mich. 138; People v.

Liscomb, 60 N. Y. 559; In re Patterson, 99 N. C. 407; In re Walker, 82 N. C. 98; Com. v. Newton, 1 Grant Cas. 453; In re Pierce, 44 Wis. 411; as also where the commitment is for an indefinite time. Ex parte Kearby, 35 Tex. Cr. R. 531; Yoxley's Case, 1 Salk. 351; Rex v. James, 5 Barn. & Ald. 894, 7 E. C. L. 292; Cromartie v. Commissioner, 85 N. C. 211; In re Hammel, 9 R. I. 248; In re Leach, 51 Vt. 630; People v. Pirfenbrink, 96 Ill. 68; State v. Myers, 44 Iowa, 580; Bickley v. Com., 2 J. J. Marsh, 575; Ex parte Alexander, 2 Am. Law Reg. (O. S.) 44; In re Watson, 3 Lans. 408; Com. v. Roberts, 4 Pa. Law J. 126.]

" 'If the judgment is not conclusive upon the question of the authority of the court to render it when the facts are not therein recited, then the recitation or partial recitation of the facts in such judgment, and upon which it is predicated, will not add anything more to its sanctity than if unrecited, and such judgment. is as much the subject of attack as if such facts were entirely omitted. If the unrecited facts would not or do not authorize the particular judgment rendered, then the mere recitation of the same facts in the judgment will not make it valid, nor add strength or vitality to it. If the judgment is void, in either event it is the subject of inquiry in a *habeas corpus* proceeding, and it must be void to be so attacked. [Authorities supra.] In Parker's Case, 35 Tex. Cr. 12, this question was expressly decided. The judgment in that case recited as a fact that the court adjourned on May 14, 1892, and it was attacked on *habeas corpus* on the ground that this recitation was false, in that the court as a matter of fact did not adjourn on May 14, but did adjourn after twelve o'clock at night of said day, which rendered the judgment void, because said court by law was necessarily terminated at midnight of said day. The contention was that the verdict was returned into court after twelve o'clock at night, and on this issue the case was tried

by that court. If the verdict was returned after twelve o'clock at night, it was void, because as stated above, the term of the court had necessarily terminated at the hour of midnight, and before the verdict was rendered. The recitation of fact in the judgment, if true, constituted the verdict a legal one, and the judgment valid. It was contended in that case, as it is in this, that the recitation of the fact in the judgment was conclusive, and not subject to attack in the *habeas corpus* proceeding. That court, however, held otherwise, and that it was permissible "to go behind the record, and probe into the very truth of the matter," etc. Judge HENDERSON, delivering the opinion of the court, uses this language: "Notwithstanding the recitals in the judgment in this case, we hold that it is competent, under the writ of *habeas corpus,* to go behind the record, and probe into the very truth of the matter, as to whether an act purporting to have been done during the term was in fact done during the time recited by the record." See, also, Ex parte Juneman, 28 Tex. App. 488; White's Ann. Code Cr. Proc., sec. 98, subsecs. 6, 7, also sections 130 and 131, for collated authorities, as well as the authorities cited supra. After hearing the facts in that case, the court sustained the judgment of the trial court. The Parker case, then, is authority for the further proposition that we will hear the facts on controverted issues of this character, and where there is a conflict in the evidence, which may or may not support the judgment, and there is sufficient evidence to support the judgment, that we will not disturb the ruling of the trial court. The writer did not participate in the decision of the Parker case, as will be seen by the report of that case. That case is decisive against the State's contention that the recitation of the facts in the judgment is conclusive, and cannot be attacked on *habeas corpus,* and that case must follow the unbroken line of decisions in this State since Ex parte Degener, supra. The

same rule obtains as to orders, etc., of the court. [See Ex parte Lake, 37 Tex. Cr. R. 656.]'

"In Ex parte Irvine, 74 Fed. l. c. 959, TAFT, Circuit Judge, said:

" 'The first question for consideration in this hearing is how far this court may look beyond the commitment and its recitals into the evidence and circumstances upon which the committing court acted. It is and must be conceded that the court had full jurisdiction to try the indictment, to issue the subpoena which brought the witness to the stand, and to direct him to be sworn. It had jurisdiction over the defendants and over the cause. But the act of the court here complained of, while in the course of the trial of the indictment and of the defendants, concerned one who was not a party to the proceeding; and the jurisdiction of the court with reference to the witness is distinct from, though it grows out of, the jurisdiction to try the indictment. It is possible that the witness, by a direct proceeding in error as from a criminal case, might have the validity of his sentence inquired into by an appellate court. Whether this be true or not, it is unnecessary to decide. It is clear that the decisions of the Supreme Court require this court to hold that, upon such a question as this, the testimony and facts upon which the court acted in committing the witness may and must be considered by the court before which the validity of the commitment is to be tested in a collateral way upon *habeas corpus*. In the Counselman case, the whole proceeding, together with all the evidence given by the witness and the action of the court, was examined on *habeas corpus*. In the case of Ex parte Fisk, 113 U. S. 713, the question was on *habeas corpus* to determine the validity of the commitment for contempt of a party defendant to an action removed to the Federal court from the State court in New York, for his refusal to answer a question put to him in a proceeding author-

ized by a statute of the State for the examination of defendants before a master prior to the trial. In that case the court held that the statutory procedure was not applicable to the Federal court, and therefore that the court was without power to compel a witness to answer in such proceeding, and that the commitment was void. In that case the entire proceeding before the circuit court was considered by the Supreme Court. The question whether the statute applied to the examination of witnesses in a Federal court was a mere matter of procedure, which, with reference to the cause under consideration by the court, could not affect its jurisdiction. It had the power to decide whether that procedure should be followed in the cause, and a judgment rendered by it in the cause would not have been void, even though reached by evidence obtained in accordance with the State statute; but when the statute was used as the basis for a commitment for contempt by a witness who declined to answer, its application to the Federal practice did affect the power and jurisdiction of the court to commit the witness whose testimony was invoked under it. In the light of the Counselman case and the case of Ex parte Fisk, the duty of this court to examine into and consider the facts upon which the trial court acted in committing the petitioners cannot be doubted. If the petitioners, in their refusal to answer the questions, were within the protection of the Fifth Amendment of the Constitution, the power of the court to commit them for their refusal was exceeded, and the invalidity of the commitment may be declared in this collateral inquiry.'

"So, too, in this State, SHERWOOD, J., has gone into the question. In Ex parte O'Brien, 127 Mo. l. c. 489, he says:

" 'But there are other grounds to be now examined which go to the validity of the commitment in question. Our *Habeas Corpus* Act contains a section which declares that: "No court under the provisions

of this chapter, shall in any other matter have power to inquire into the legality or justice of any process, judgment, decree or order of any court legally constituted, nor into the justice or propriety of any commitment for contempt, made by any court, officer or body, according to law, and plainly charged in such commitment as hereinbefore provided.' " [Sec. 5379.]

" 'Notwithstanding this provision, however, it has been ruled in New York, upon a similar statute, that a party committed has "an undoubted right to show that the committing magistrate acted without authority; and this is so, notwithstanding the commitment recite the existence of the necessary facts to give jurisdiction. No court or officer can acquire jurisdiction by the mere assertion of it, or by falsely alleging the existence of facts on which jurisdiction depends." [People v. Cassels, 5 Hill, 164.] See, also, Welch v. Nash, 8 East, 1. c. 403, as to the inability of assertions made on the record to create facts.

" 'The force and effect of the statute of New York, as already adverted to, were elaborately discussed in People ex rel. v. Liscomb, 60 N. Y. 559, where People v. Cassels, supra, was quoted from with approval, and it was there said that: "The prohibition of the forty-second section of the *Habeas Corpus* Act, forbidding the inquiry by the court or officer, into the legality of any previous judgment, decree or execution specified in the twenty-second section, does not and cannot, without nullifying, in good measure, the provisions of that and other sections of the act, take from the court or officer the power, or relieve him from the duty of determining whether the process, judgment, decree or execution emanated from a court of competent jurisdiction; and whether the court making the judgment or decree, or issuing the process, had the legal and constitutional power to give such judgment, or send forth such process. It simply prohibits the review of the decision of a court of competent jurisdiction. . . .

Ex parte Creasy.

The inquiry is, necessarily, in every case, whether the process is void, and the officer or court having jurisdiction of the writ must pass upon it. If a process good in form issued upon a judgment of a court having jurisdiction, either general or limited, must in all cases be assumed to be valid until the judgment be reversed upon error, the remedy by writ of *habeas corpus* will be of but little value." And that the relief afforded at common law by "this, the greatest of all writs," is, under the Constitution beyond the pale of legislative discretion and should not be "shorn of its power and its glory by a subtle and metaphysical interpretation; rather should it receive a liberal construction, in harmony with its grand purpose, and in disregard, if need be, of technical language used."

" 'An author already quoted says: "But, while it is held in many of the earlier cases, that if a court has jurisdiction of the person, place, and subject-matter, its judgment cannot be successfully attacked upon *habeas corpus,* other courts hold that jurisdiction of the person, place, and subject-matter are not alone conclusive, and that the jurisdiction of the court to render the particular judgment in question is a proper subject of inquiry. A court may have authority to hear and determine a case, but its determination or judgment must be within the confines of the law, and such power does not authorize it, simply because it has jurisdiction to render some judgment in the case, to trample down the prisoner's fundamental and constitutional rights by pronouncing a sentence unauthorized by law." [Church on Hab. Corp. (2 Ed.), sec. 368; Ex parte Lange, 18 Wall. 163, and other cases cited.]'

"In this case the commitment recited that the contempt occurred in the presence of the court, when as a matter of fact, as shown by proof *aliunde* in contravention of the terms of the commitment, the alleged acts were not in the presence of the court. This

was the situation in the case which called for the foregoing discussion.

"The same point was urged by counsel for petitioner in both of the cases of In re Clark, 208 Mo. 121, and In re Shull, 221 Mo. 623, but the question is not directly passed upon in either.

"In the former case however (208 Mo. l. c. 142) we did say something as to the high character of the writ of *habeas corpus,* which has the right ring, thus:

" 'The circuit attorney brings to our attention the decision of the St. Louis Court of Appeals denying petitioner his discharge from the same judgment and commitment challenged here. It goes without saying that, with this court, a decision bearing the hall-mark of a court of so high authority as the St. Louis Court of Appeals passes current as persuasive and instructive. We do not understand the circuit attorney to make the out-and-out contention that the decision in question rises to the plane of *res adjudicata*; but if such be his position, implied or by indirection, it is not sound. A plea of estoppel by record in a *habeas corpus* case is good on the same facts where the prisoner has been discharged, but is bad where the prisoner has been remanded, as here. This is so because judges may be likened unto priests attending between the horns of the altar in the temple of justice. So attending, they stand solemnly charged with keeping the lamp of personal liberty in oil, well trimmed and brightly burning. It is so because the liberty of the citizen is an immediate jewel of the law to be sacredly cherished and hedged about withal. Therefore, no mere legal fictions, good for use in matters of less moment, or matters of punctilio, or comity between courts, may shield any one restraining an American citizen of his liberty from having the why and wherefore of that restraint summarily looked into by any court of competent jurisdiction in the land. The discretion of one judge in remanding the prisoner does

not bar the discretion of another in discharging the prisoner on *habeas corpus.* Wherefore, when the great writ goes down—a writ whose origin is beyond the dawn of English history, whose final and triumphant establishment was a landmark in the evolution of civil liberty, making the hearts of its lovers leap for joy— to the prisoner, the doors of jails open, he comes into court with his shackles dropped and the cause of his imprisonment, the very marrow of it, is laid bare to the utmost verge and minutiae permitted by written law. And this, too, no matter what court has theretofore denied relief, unless it be a court of superior jurisdiction. [R. S. 1899, sec. 3546.]'

If former adjudication in another *habeas corpus* proceeding will not estop a subsequent inquiry as to facts surrounding the detention of a citizen, why should it be said that the findings of fact made by the presiding judge of the court against which the offense of contempt was committed, would forever seal the lips of a petitioning citizen from showing the facts surrounding the judgment committing him. If the high character of the writ under the Constitution is such as to preclude the doctrine of *res adjudicata,* so long as the petitioner is in custody, why should not the same rule apply to facts surrounding and entering into the particular judgment.

"We are firmly of opinion that, as to contempt judgments, such judgments can be attacked in *habeas corpus* for (1) want of jurisdiction over the person, (2) want of jurisdiction over subject-matter, and (3) want of jurisdiction in the particular case owing to the facts thereof, although the first two requisites are fully met.

"In other words, as said by the Texas court, 'nor can the court make contempt of that which is not contempt; and every attempt to do so would be in excess of *authority or jurisdiction,* as much so as if the court had no authority or power to punish for contempt,

either in relation to the person or subject-matter. There must be contempt in order to justify punishment for that offense.'

"Proof that there was in fact no contempt should avoid the judgment. We are aware that there are generalizations in the books, which appear opposed to this doctrine, but if we are to give full vitality to the constitutional writ of *habeas corpus,* such should be the law. If not, the hearings upon writs of *habeas corpus* become mere perfunctory proceedings in which we determine a mere paper case, i. e., (1) has the court jurisdiction of the person and subject-matter, and (2) has the court (whether truly or falsely) recited facts enough to constitute contempt. Such a hearing would be far from the hearing so forcefully put by our Brother LAMM, in Clark's case, supra, when he said: 'Wherefore, when the great writ goes down—a writ whose origin is beyond the dawn of English history, whose final and triumphant establishment was a landmark in the evolution of civil liberty, making the hearts of its lovers leap for joy—to the prisoner, the doors of jails open, he comes into court with his shackles dropped and *the cause of his imprisonment, the very marrow of it, is laid bare to the utmost verge and minutiae permitted by written law.*' The italics are ours. Prison doors are but temporarily opened, if under this great and benign writ we are bound by the mere *ipse dixit* of a judge finding for us the facts: The leaping of hearts for joy would only last long enough for the State prosecutor to read a false finding of fact in a well written judgment, which finding made contempt wherein there was no contempt; there the 'very marrow' of the cause if the imprisonment might be fully shadowed by a perverse finding of facts, which would prevent its being 'laid bare.'

"Furthermore our statute, section 2468, Revised Statutes 1909, seems to contemplate the practice for which we contend. That section reads: 'The party

brought before any court or magistrate, by virtue of any writ of *habeas corpus,* may deny the material facts set forth in the return, or allege any fact to show, either that his detention or imprisonment is unlawful, or that he is entitled to his discharge; which allegation or denials shall be on oath.'

"II. Going a step further, I do not agree to the opinion written, because on the admitted facts there was no contempt committed. I care not whose statement of the facts we consider. The petitioner did not fail to answer the questions propounded, when he said: 'I could not say, possibly I did.' 'I could not say, probably I did.' These two answers answered both questions propounded. The two questions were:

" 'Question 1. H. P. Creasy, did you on September 22, 1911, buy one pint of whisky for Jimmy, the tailor, that works for Harrell?

" 'Question 2. H. P. Creasy, did you on Thursday, September 21, 1911, about six o'clock p. m., buy one-half pint of whisky for Tom Newby, from the negro, Squire Bannister, at Tom Morris's drugstore?' "

"It may be that the answers were not truthful, but they answered the questions. If not truthful the petitioner subjected himself to a charge of perjury, but not to a charge of contempt for refusing to answer a question. There is a marked difference between a refusal to answer a question so as to render one guilty of contempt of a court directing an answer, and untruthfully answering the question. The facts of this record may tend to show perjury, but do not show contempt based on the ground of a refusal to answer questions. Under the admitted facts the trial judge has found contempt, where none in fact exists. He has adjudged contempt where there was no contempt, and in this his judgment is void for want of power to enter the particular judgment. The *ipse dixit* of no court can make contempt of that which does not rise

to the level of contempt. If this man has been guilty of perjury the courts are open, but the summary process for contempt does not lie in such a case.

"III.   The petitioner should be discharged for a further reason, apparent upon the face of the record from the circuit court.

"Our statute, Revised Statutes 1909, section 3884, reads: '. . . Whenever any person shall be committed for any contempt specified in this chapter, the particular circumstances of his offense shall be set forth in the order or warrant of commitment.' [R. S. 1899, section 1619.]

"The statutory power to punish for the kind of contempt involved in this case is found in Revised Statutes 1909, section 3881, the material portions of which section are: 'Every court of record shall have power to punish as for criminal contempt, persons guilty of: . . . fifth, the contumacious and unlawful refusal of any person to be sworn as a witness, or, when so sworn, to refuse to answer any legal and proper interrogatory.'

"The circuit court was proceeding under the latter part of clause five of said section.

"The prisoner was committed upon a certified copy of the court's judgment placed in the hands of the sheriff as his warrant of commitment. Such judgment, therefore, becomes important. It reads:

" 'Now at this day comes W. F. Robinson, foreman of the grand jury, duly impaneled, sworn and charged and now sitting within and for Boone county, Missouri, and reports to the court in writing that one H. P. Creasy, who has been duly subpoenaed to appear as a witness before said grand jury, has refused to answer proper and lawful questions propounded to him, the said H. P. Creasy, by said grand jury, which said questions are submittted to the court in writing

by the said foreman of said grand jury, and are as follows, to-wit:

" ' "Question No. 1. Did you on September 22, 1911, buy one pint of whisky for Jimmy, the tailor that works for Harrell?

" ' "Question No. 2. Did you, on Thursday, September 21, 1911, at about six o'clock p. m., buy one-half pint of whisky for Tom Newby from the negro Squire Banister, at Morris's drugstore?"

" 'And the court having determined that the witness is bound to answer said questions and having informed the grand jury of its decision, the said H. P. Creasy, having persisted in his refusal to answer said questions so propounded to him by said grand jury, is brought before the court, and the questions being read to him and explained and being admonished by the court to answer said questions, still refuses and declines to answer said questions and says and announces to the court that he will not answer said questions, and the court, believing and finding that the refusal of said witness to answer said questions is wilful and contumacious and in contempt of said grand jury and of this court, doth find the said H. P. Creasy to be guilty of contempt of this court and doth order and adjudge that the said H. P. Creasy, for said contempt of court, be punished by imprisonment in the county jail of Boone county, Missouri, for a term and period of six months.

" 'And the clerk of this court is directed to forthwith make out a commitment for the said H. P. Creasy and deliver the same to the sheriff or keeper of the jail of Boone county, directing him to receive and imprison the said H. P. Creasy for the term aforesaid.'

"This judgment, to my mind, fails to measure up to the demands of the statute. Under the statute, the *particular circumstances* of his offence shall be set forth in the order or warrant of commitment. The order in this case does set forth the questions asked

the petitioner, but does not undertake to give the response made by the petitioner. If the petitioner said 'I refuse to answer those questions,' this fact should be set out, and not the mere conclusion of the court that the petitioner had refused to answer the questions. If the petitioner responded in any other way, his response should be set out, and not the court's conclusion of what that response was. This case emphasizes our discussion of these statutes in the case of In re Shull, 221 Mo. l. c. 627. In that case we discharged the petitioner because the commitment stated conclusions rather than facts and circumstances. In this case the return of the sheriff, made a part of the record proper before this court, says 'that the judge then explained to the said H. P. Creasy that, what the grand jury wanted was an unequivocal answer to their questions—that is, "Yes" or "No," and that the event being of such recent occurrence that he, the said H. P. Creasy, certainly should be able to remember them and make definite reply; that thereupon said H. P. Creasy replied to the said judge of said circuit court, "I can't give them any different answer—that is the best I can do for you." '

"This return further and previously shows that at the time the petitioner was before the court the court was there informed of the fact that petitioner had answered the questions 1 and 2 to the grand jury by the following answers: 'That to said question No. 1, H. P. Creasy made the following answer: "I could not say—possibly I did." That to question No. 2, H. P. Creasy made the following answer: "I cannot say—probably I did." '

"This fact and the circumstance should have been stated in the order of commitment and judgment. In contempt cases it is facts and circumstances which go to make up the contempt which must be set forth and not the legal conclusions of the judge as to what are the facts and circumstances.

"In Shull's case the court said:

" 'Contempt of court is a specific criminal offense, and a fine imposed is a judgment in a criminal case. The adjudication is a conviction, and the commitment in consequence thereof is execution. [Church on Habeas Corpus (2 Ed.), section 308; Ex parte Kearney, 7 Wheat. 38.] It is in recognition of this principle that the General Assembly, by the foregoing statutory provisions, requires that when a citizen is committed to prison for contempt, the commitment itself shall contain "the particular circumstances of his offense," or in the language of section 3576, the contempt itself must be plainly and specially charged in the commitment. When the commitment in this case is tested in the crucible of the law it is found to fall far short of the requirements of the statute. Similar statutes are found in other States. If we look at the recitals of the order leading up to the adjudication of the contempt there is no effort made to state the particular questions, the refusal to answer which constitute the contempt. We are simply told that the petitioner had treated the court disrespectfully in refusing to answer proper and legal questions propounded to him. It is not even found that said questions were material and pertinent, but aside from this last consideration the statute requires the facts themselves to be stated, not merely the court's conclusions that the questions were legal and proper, and when we come to the adjudication of the contempt itself, it is not even put upon the ground of the refusal to answer questions, but the finding and the only finding is that petitioner had treated the court *disrespectfully*. In what manner or how the petitioner had treated the court disrespectfully the court did not adjudge and state in its judgment. If it should be said it can be inferred by the matter of inducement set out in the record, the answer of all the courts is that as this is a criminal proceeding

243 Sup.—45

by which the citizen is deprived of his liberty, presumptions and intendments will not be indulged in in order to sustain a conviction for contempt of court. . . . In California the statute requires that the court or officer make a statement of the facts. In Ex parte Shortridge, 90 Pac. 478, the order committing an attorney for contempt recited that he "interrupted" the court proceedings, without stating what he did, and it was held it did not comply with the statute requiring the court to recite the facts. The court quoted with approval the statement of the Supreme Court in Schwarz v. Superior Court, 111 Cal. 106, to-wit: "The offense being criminal in its nature, both the charge and the finding and judgment of the court thereon are to be strictly construed in favor of the accused," and hence the order of adjudication must state facts which show the prisoner guilty of contempt, not mere conclusions, and such is the obvious meaning and purpose of our statutes, sections 1619 and 3578, Revised Statutes 1899. [9 Cyc. 48 and 50.] Without further discussion, we think the judgment of contempt and the commitment are fatally defective in not finding and adjudging the facts which would show petitioner had acted so disrespectfully towards the circuit court as to constitute a contempt within the statute.'

"In the case at bar had the judgment showed the facts, i. e., that questions one and two had been propounded by the grand jury, and that petitioner had answered such questions to the grand jury in the manner above indicated; that these answers were before the court; that the court informed the petitioner that what the grand jury wanted was answers 'Yes' or 'No' to each question, and to such suggestion of the court the petitioner responded 'I can't give them any different answer—this is the best I can do for you,' we would have an entirely different case before us. We would have the actual facts as admitted by all the par-

ties, and not this mere legal conclusion of the judge that the witness 'refused to answer questions.'

"This case fully demonstrates the wisdom of the law which requires an outline of the facts and circumstances rather than the court's conclusions. The return on file here and made under oath further says: 'The said circuit judge announced that he was convinced from the manner of the replies of said witness to the questions, and from his general demeanor whilst before and in the presence of the court that he, the said H. P. Creasy, was wilfully and intentionally withholding proper information sought by the grand jury;' yet neither the return made to this court, nor the judgment *nisi* undertakes to reveal the facts. The petitioner's manner of answering the questions is not given, nor his demeanor even vaguely described. We have only the bare naked conclusions.

"Upon the record itself this petitioner must be discharged. He may be guilty of perjury and this is a whisky case, but sound *habeas corpus* law must be written even in whisky cases. We cannot have different doctrines of *habeas corpus* law, one applicable to whisky cases, and the other for the higher toned cases.

"The Constitution guards the liberty of the felon with the same eagle eye that it does the infant and pure girl. In each when unlawful detention is charged, the facts of that detention must be laid bare. In contempt proceedings which result in detention of one's liberty, the law says that the facts and circumstances of the contumacious acts must be spread of record in the commitment or order of commitment. Such was not done here, and petitioner's legal rights have been invaded, even though he be an ordinary bootlegger. With the latter charge we have nothing to do here, but the law furnishes a forum for the orderly prosecution of such offenders, as well as for the felon who has been

guilty of perjury. Bootlegging and perjury, however, are not necessarily contempts of court.

"IV. The judgment is void on the face of the record, for other reasons, (a) the punishment fixed, six months in jail, is in violation of section 3882, Revised Statutes 1909. That section reads:

" 'Punishment for contempt may be by fine or imprisonment in the jail of the county where the court may be sitting, or both in the discretion of the court; but the fine in no case shall exceed the sum of fifty dollars, nor the imprisonment ten days; and where any person shall be committed to prison for the nonpayment of any such fine, he shall be discharged at the expiration of thirty days.'

"I am aware that this section has been declared unconstitutional in the case of State ex inf. v. Shepherd, 177 Mo. 205, and Railroad v. Gildersleeve, 219 Mo. 170, but I think those cases are wrong and ought to be overruled.

"In the Gildersleeve case, supra, our brother Lamm, in an exhaustive dissenting opinion discusses this statute. I thought then and I think now that his opinion is unanswerable. I shall not rediscuss the question there so elegantly presented. A reference to that opinion will suffice. To my mind the sooner some of the broad doctrine of both the Shepherd and Gildersleeve cases is overruled, the better it will be for the jurisprudence of the State. Let those cases be overruled to the extent indicated in the dissenting opinion in the Gildersleeve case, supra. (b) But there is a further reason for holding this judgment bad. The judgment should only have committed the petitioner to jail until such time as 'he give such evidence.' Upon the giving of such evidence he should be discharged. Section 5081, Revised Statutes 1909, provides that witnesses who refuse to testify before a grand jury shall be brought before the court and said section 5081 also

provides, as to the duties of the court, this: 'who shall proceed therein in the same manner as if the witness had been interrogated and refused to answer in open court.' This procedure is thus outlined by section 6372, Revised Statutes 1909: ' . . . A person summoned as a witness, and attending, who shall refuse to give evidence which may lawfully be required to be given by such person, on oath or affirmation, may be committed to prison by the court, or other person authorized to take his deposition or testimony, there to remain, without bail, until he gives such evidence.'

"This section limits the imprisonment to such time as the witness shall give such testimony. Upon the giving of such testimony he is, perforce of the law, purged of the contempt or contumacious act. This seems to have been the construction given this statute from the early case of Word v. State, 2 Mo. 120, in the year 1827, down to this date.

"So that we say for these reasons apparent from the face of the record the petitioner should be discharged. To the end that the importance of this little case to jurisprudence might be seen, we have elaborated more than should have been done in an opinion, but the sacredness of constitutional provisions has prompted the act and is our only excuse therefor."

In accordance with the views expressed in the foregoing opinion, the petitioner should be discharged. It is so ordered. All concur, except *Valliant, C. J.*, not sittting.

## CONCURRING OPINION.

WOODSON, J.—In my opinion the petitioner should be discharged for the reason that section 28 of article 2 of the Constitution of 1875 guarantees to every person the right to a trial by jury in all civil and criminal cases.

In my opinion, the conduct of the petitioner, in answering the questions propounded to him, as he did, was not in contempt of court, as provided for and defined in section 3881, Revised Statutes 1909. That section after granting to all courts of record the authority to punish for contempt, proceeds to define what contempt is, and among other things, in the fifth clause thereof, it is provided that the contemptuous and unlawful refusal of any person to be sworn as a witness, or who when sworn, refuses to answer any legal and proper interrogatory, shall be guilty of contempt within the meaning of that article.

The petitioner did not refuse to be sworn, but upon the contrary, the record shows that he was duly sworn and testified in the case; nor did he contemptuously or unlawfully refuse to answer any question which was properly propounded to him, but upon the contrary he, in a dignified and respectful manner, answered all interrogatories propounded to him. It necessarily follows therefrom that the petitioner was not guilty of contempt of court, as defined in said statute.

That brings us to the consideration of the character of the answers given, by the petitioner, to the interrogatories propounded to him by the court and counsel. If they were false, then he was guilty of the crime of perjury; and if true, then he was neither guilty of contempt of court nor of the crime of perjury, but was innocent. Consequently, the truthfulness or falsity of his testimony was one of fact, and being a felony, punishable by imprisonment in the penitentiary, he was clearly entitled to a trial by jury under the guaranty of the section of the Constitution before mentioned.

If that is true, and I am unable to see why it is not, then a jury, and not the court, should have passed upon his guilt or innocence; and as that was not done, the petitioner should be discharged.

II. The real contention of counsel for respondent is that, since the judiciary is one of the three coordinate departments of the State government, and each being separate and independent of the other two (article 3 of the Constitution), the Legislature had no power or authority under the Constitution to limit the inherent authority of the circuit court to punish persons for contempt of court, as was attempted to be done by said section 3881, Revised Statutes 1909. It is, therefore, contended by them, that said section of the statute is violative of said artcile 3 of the Constitution, and consequently is null and void.

In suport of this contention, we are cited to the cases of State ex inf. v. Shepherd, 177 Mo. 205, and Chicago, Burlington and Quincy Railway Company v. Gildersleeve, 219 Mo. 170.

There is no question but what both of those cases sustain this contention of counsel.

While the former case was decided by the unanimous court, yet the latter was by a divided court; four members concurred in holding the defendant guilty of contempt, and that the circuit court had the inherent authority to punish for contempt, and that the Legislature had no authority to limit or abridge that authority; and three members of the court dissented from the last proposition, holding in a dissenting opinion by LAMM, J., that the Legislature has such authority.

The writer was one of the dissenters mentioned in the last case decided, believing that under the laws of the State the Legislature has, within reasonable bounds, the authority to limit the power of all courts to punish for contempt; and I am of that opinion still.

In that case, Shepherd was proceeded against in this court, on information filed by the Attorney-General, charging him with publishing certain libelous charges against the court. The defendant was cited to appear and show cause, if any he had, why he

should not be punished for contempt of court. Upon the return day, he appeared and filed return to the information, and upon the return the court found him guilty and fixed the penalty at the sum of $500. It was there insisted by the defendant, as it is here by the petitioner, that the court has no absolute inherent authority to punish him as contended for by the respondent, but that its authority was limited by sections 3881 to 3884, Revised Statutes 1909, and that said sections were constitutional and valid. This insistence, in my opinion, was well taken, and that the conclusion reached in that case was erroneous cannot be successfuly refuted. My reasons for so stating, are briefly these:

Section 14 of article 2 of the Constitution, denominated the "Bill of Rights," provides: "That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will, on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

Under this constitutional guaranty, Mr. Shepherd published the article previously mentioned, and under the provisions thereof, he was clearly entitled to plead and prove the truthfulness thereof, which if true, was a perfect defense to the "prosecution" instituted by the Attorney-General; and in the express language of said section of the Constitution, he had the unquestionable right to have a jury, "under the direction of the court," to "determine the law and the fact," of his case.

No disinterested person, in my opinion, can read the opinion in that case, and the constitutional provision before quoted, and come to any other rational conclusion, than that this court erroneously denied to Mr. Shepherd the right to have a jury pass upon both

the law and the fact in that case, and to say whether or not he was guilty of contempt, as charged against him.

The section of the Constitution quoted is general in its terms, and includes all "suits and prosecutions" and no exception whatever thereto is saved by its provisions. The fact is, which is made perfectly clear by the history of said constitutional provision, that the framers of the Constitution intended that said section of the Constitution should specially apply to the executive, legislative and judicial departments of the State, and generally to all persons within the State.

It has been held by this court, and by all other courts of this country, where a constitutional provision similar to ours has been adopted, that it is but the adoption of the Fox Act of England, governing the same subject, and expressed substantially in the same language.

The history of that act is briefly this: Prior to its enactment, the courts of England were dominated by the king, and for centuries all publications unfavorably criticising the king or his government were promptly arrested and prosecuted for criminal libel, and of course, were found guilty and severely punished by the courts, which were but the mouth-pieces of the king. In order to remedy that evil and oppression, the Fox Act was enacted, thereby depriving the courts of England from trying the fact, or declaring as a matter of law, as they had theretofore been in the habit of doing, that a publication was libelous, either in law or fact, and transferred that power and authority to a jury of defendant's peers.

While the language of said act is general and includes all persons and classes, yet when viewed in the light of the history of the act, it clearly appears that it was designed especially for the governing classes of England, and when the people of this State, and country, adopted the Fox Act, they did so to pre-

vent the commission· in this country of those evils which existed in England, and which said act was designed to abolish in that country, namely, to prevent the courts of the State from trying or declaring as a matter of law that any publication criticising the State government, or any department thereof, was libelous, and that the author thereof was guilty of a crime.

The people of this State, and of this country generally, apprehending that the governing classes might assume unto themselves the arbitrary power so frequently, unjustly and oppressively exercised by the courts of England, in trying or declaring as a matter of law that any and all publications criticising them were libelous, adopted the constitutional provision previously set forth, for the purpose of preventing those evils, and to guarantee to all persons generally the freedom of speech, and the right to publish whatever they deemed proper, being responsible only for the abuse of that liberty.

If we view said section 14 of article 2 of the Constitution in the light of its history, then there can be no doubt but what the judiciary and all other departments of the State are clearly embraced within the subjects referred to therein. That being unquestionably true, it necessarily follows therefrom that Shepherd was unlawfully denied the right to have a jury pass upon the law and fact of his guilt or innocence.

I am, therefore, clearly of the opinion that the Shepherd case was erroneously decided; and the Gildersleeve case, being bottomed upon the Shepherd case, it must also fall for want of proper support or authority upon which to rest.

It is true that other cases are cited in support of both of those cases, but when we look at the principles of our government as announced in our Constitution and laws, it is clearly seen that they are contrary to the personal liberty of the citizen, and the spirit

of our institutions, and should not for that reason be followed.

I am, therefore, of the opinion that the Shepherd and Gildersleeve cases should be no longer followed, but should be overruled, and consequently the petitioner should be discharged. *Kennish, J.,* concurs herein.